UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| TINA H.[1], | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )    CIVIL NO. 3:20cv743 |
| | ) |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

2

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since June 15, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*)

3. The claimant has the following severe impairments: degenerative disc disease/spondylosis of the lumbar spine; chronic pain syndrome; status post septic arthritis and recurrent infection/abscess of the right sternoclavicular joint; and, obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant can occasionally climb ramps and stairs, she can never climb ladders, ropes, or scaffolds, she can occasionally balance, stoop, kneel, crouch, and crawl, she can never reach overhead with the right dominant upper extremity, she can frequently handle with the right dominant upper extremity, and she should avoid concentrated exposure to hazards, such as wet, slippery, or uneven surfaces, unprotected heights, and vibratory hand tools.

6. The claimant is capable of performing past relevant work as a loan officer and assistant branch manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2015, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 12-19).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on June 30, 2021. On August 11, 2021 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on August

24, 2021. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). In the present case, Step 4 was the determinative inquiry.

Plaintiff, applied for DIB on August 8, 2017, alleging disability beginning June 15, 2015. (Tr. 10). Upon initial review, the Disability Determination Bureau ("DDB") denied Plaintiff's claim for DIB on October 31, 2017. *Id*. Upon reconsideration, the DDB again denied Plaintiff's claim on December 7, 2017. *Id*. Accordingly, on February 1, 2018, Plaintiff filed a request for an administrative hearing with the Office of Disability Adjudication and Review ("ODAR"). *Id*. On October 18, 2018, Plaintiff appeared in Elkhart, Indiana, for an administrative hearing before ALJ Stephanie Katich. *Id*. The ALJ issued an unfavorable decision on December 20, 2018, assigning

4

Plaintiff a residual functional capacity ("RFC") that allowed for light work. (Tr. 15). Plaintiff then filed a request for review with the ODAR's Appeals Council on February 2, 2019. (Tr. 183). Upon review of the ALJ's decision, Plaintiff's claim was again denied by the Appeals Council on November 20, 2019. (Tr. 5). Consequently, Plaintiff timely filed her present Complaint with this Court on September 1, 2020.

Plaintiff was born July 6, 1965. (Tr.184). Therefore, on Plaintiff's alleged onset date of June 15, 2015, Plaintiff was fifty years old. *Id*. Plaintiff has completed educational course work through grade twelve. (Tr.197). Plaintiff has not engaged in substantial gainful activity since her alleged onset date. (Tr. 12). During Plaintiff's working career, she worked as a loan officer and assistant branch manager. (Tr. 19).

On February 6, 2009, Plaintiff received an MRI of the lumbar spine after complaining of low back pain with left-sided sciatica. (Tr. 346). This MRI study revealed an interval increase in degenerative disc disease at L3-L4 and L4-L5 when compared to a September 17, 2004, MRI. (Tr. 447). Additionally, the February 2009 MRI demonstrated interval development of a moderate to large right paracentral disc protrusion at L4-L5, narrowing the right lateral recess and causing apparent impingement of the traversing right L5 nerve root. *Id*.

Plaintiff presented to Dr. Jamie E. Gottlieb on February 25, 2009, complaining of back and leg pain. (Tr. 296). During this appointment, Plaintiff described her pain as an "intermittent back and leg discomfort that has really worsened over the past 6 weeks with left greater than right leg pain that is . . . aching and burning in nature with back and buttock pain." *Id*. Upon physical examination, Plaintiff demonstrated a positive straight leg raise on the left side and tenderness with palpation at the left L4-L5 facet joint as well as some notch tenderness. *Id*. Ultimately, Dr.

Gottlieb assessed Plaintiff with lumbar spondylosis, lumbar stenosis, and lumbar radicular syndrome. *Id*. Consequently, Dr. Gottlieb recommended physical therapy and gave Plaintiff a course of Neurontin. *Id*. In a pain questionnaire completed the same day, Plaintiff reported that she experiences weakness in her legs and tingling in her hands. (Tr. 300). Plaintiff also reported that her pain is so severe that it wakes her up at night and is exacerbated by standing, walking, rising from a chair, and physical activity. (Tr. 300-301). An x-ray study performed on February 25 revealed "moderate narrowing of the L3-L4 and L4-L5 disc spaces with mild anterior and posterior bony spurring as well as mild narrowing of the lumbosacral disc space, consistent with degenerative disc disease changes. (Tr. 345).

On March 6, 2009, Dr. Gottlieb referred Plaintiff to pain management specialist Dr. Jasveer Grewal for additional evaluation of Plaintiff's "lumbar spondylosis, stenosis, and radicular pain with consideration for epidural steroid injection." (Tr. 314). During this appointment, Plaintiff reported "significant low back pain and radiation into the left lower extremity" that had "significantly worsened." *Id*. Plaintiff described her pain as a constant aching, radiating, sharp-shooting, spasming, stabbing pain aggravated by arching her back, getting up, sitting, standing, twisting, walking, and weather. *Id*. Plaintiff further noted associated symptoms such as weakness in the left lower extremity. *Id*. Upon physical examination, Dr. Grewal observed tenderness with palpation over the paraspinal muscles in the lower lumbar region and a positive straight leg test on the left side. (Tr. 315). Consequently, Dr. Grewal recommended steroid injections to treat Plaintiff's continuing pain. *Id*.

Plaintiff presented to physical therapy on March 16, 2009. (Tr. 340). During this appointment, Plaintiff reported an increase in her pain when walking or bending. *Id*. Furthermore,

6

Plaintiff demonstrated a "fair posture" with flattened lordosis. *Id*. By Plaintiff's April 9, 2009, physical therapy appointment, Plaintiff had experienced an exacerbation of her back pain. (Tr. 339). This exacerbation was slightly reduced by the time of Plaintiff's next physical therapy appointment on April 15, 2009. (Tr. 338).

By Plaintiff's next appointment with Dr. Gottlieb on April 20, 2009, Plaintiff had received two separate steroid injections to treat her back pain. (Tr. 337). While these injections reduced her pain, Plaintiff was still experiencing pain in her back and right thigh. (Tr. 295). By Plaintiff's June 24, 2009, appointment with Dr. Grewal, Plaintiff was once again experiencing "significant low back pain with radiation into the left lower extremity. (Tr.331). Consequently, Dr. Grewal recommended further steroid injections. *Id*. Plaintiff received another steroid injection on July 8, 2009. (Tr. 328). During an appointment with Dr. Grewal on July 21, Plaintiff reported 40% improvement in her pain after the injection. *Id*. However, during Plaintiff's next appointment with Dr. Grewal on September 24, 2009, Plaintiff reported recurring pain in her lower back into her lower extremity. (Tr. 326). Plaintiff repeated her complaints of unresolved pain during appointments with Dr. Grewal on January 28, 2010 and September 20, 2010. (Tr. 324, 322). During the September 20 appointment, Plaintiff reported that her pain medications were not providing sufficient overall relief, evidenced by Plaintiff's complaints of "pain ranging from 3 to 8 out of 10 on presentation." *Id*. Consequently, Dr. Grewal instructed Plaintiff to titrate up her Fentanyl dose to 75mcg. (Tr. 323).

On October 18, 2012, Plaintiff presented to Dr. Grewal complaining of continued back pain. (Tr. 319). During this appointment, Plaintiff reported a constant, worsening pain that was a 7/10 in severity. (Tr. 320). Plaintiff further reported unresolved pain to Dr. Grewal on July 12,

7

2013, when Plaintiff reported pain fluctuating between 4/10 and 8/10. (Tr. 311). During this appointment, Plaintiff described her pain as aching, cramping, and sharp, interfering with Plaintiff's sleep due to the severity. *Id*. Plaintiff reported no change in her painful symptoms during appointments on October 13, 2013, December 13, 2013, March 6, 2014, and May 2, 2014. (Tr. 356, 359, 363, 366).

On August 6, 2014, Plaintiff presented to pain management specialist Dr. David A. Beatty. (Tr. 575). During this appointment, Plaintiff reported moderate pain that was aching, sharp, persistent, shooting, stabbing, throbbing, and unbearable in character. *Id*. Consequently, Dr. Beatty continued Plaintiff's prescription for Fentanyl and Norco. (Tr. 578). On September 11, 2014, Plaintiff received an MRI of the lumbar spine. (Tr. 600). This study revealed severe spondylosis, mild disc bulging, and mild facet arthrosis at L4-L5, resulting in mild central canal stenosis, mild bilateral recess stenosis and mild bilateral neural foramina stenosis, left greater than right. (Tr. 601). This MRI further revealed severe spondylosis at L3-L4. *Id*.

Plaintiff presented to Dr. Beatty on January 28, 2015, complaining of continued back pain. (Tr. 569). Plaintiff repeated these complaints during a July 30, 2015, appointment with Dr. Beatty. However, during this appointment, Plaintiff stated that laying down, lifting, and bending increases her pain. (Tr. 366). By her next appointment with Dr. Beatty on January 7, 2016, Plaintiff's pain had worsened, and Plaintiff complained that her "right leg hurts constantly." (Tr. 563). This pain was resolved by Plaintiff's June 9, 2016, appointment with Dr. Beatty, but Plaintiff reported that walking or standing too long worsened her pain. (Tr. 560).

On December 16, 2016, Plaintiff presented to the emergency department at Elkhart General Hospital after experiencing chest pain for the previous six days. (Tr. 450). Plaintiff further

8

reported an inability to move her right arm. *Id*. A CTA study of Plaintiff's chest revealed "significant inflammatory changes in the upper right upper chest wall surrounding the right sternoclavicular joint, extending also into the anterior mediastinum." (Tr. 414). An MRI performed on December 18, 2016, revealed "[e]xtensive subcutaneous edema along the anterior upper chest wall with multiloculated rim-enhancing fluid collections along the anterior aspect of the clavicle and right sternoclavicular joint as well as along the posterior aspect of the sternoclavicular joint extending into the superior mediastinum." (Tr. 417).

On December 21, 2016, Plaintiff presented to Dr. Vanessa Sarda, an infectious disease specialist, for further treatment. (Tr. 430). During this appointment, Dr. Sarda noted that Plaintiff's CT suggested a sternoclavicular septic joint. *Id*. Dr. Sarda also noted that blood cultures taken from Plaintiff's shoulder tested positive for MSSA. (Tr. 431). On December 22, 2016, Dr. Jon Smucker performed a right incision and drainage of the abscess in Plaintiff's upper chest. (Tr. 423). After the operation, Dr. Sarda noted a recurrent abscess with deep dehiscence to the bone. (Tr. 428). An MRI of Plaintiff's upper extremity joints performed on March 7, 2017, revealed progression of the suspected septic arthritis in the right sternoclavicular joint and development of more focal inflammatory processes with a small abscess along the posterior inferior medial aspects of the right clavicle. (Tr. 413).

On March 8, 2017, Plaintiff presented to Dr. Walter Halloran, a cardiothoracic surgeon, for further evaluation. (Tr. 378). Dr. Halloran noted that the MRI performed the previous day suggested "a subcapsular abscess with severe inflammatory changes all around the joint capsule." *Id*. Consequently, Dr. Halloran assessed Plaintiff with septic arthritis of the left sternoclavicular joint, which Dr. Halloran opined, "looks terrible." (Tr. 379). Dr. Halloran further described the

9

course of Plaintiff's septic arthritis, remarking, "[Plaintiff] obviously has a deep-seated costochondritis in the sternoclavicular joint. It needs to be drained again and probably significantly debrided." *Id*. On March 10, 2017, Dr. Halloran performed a drainage and debridement procedure on Plaintiff. (Tr. 384). During the operation, Dr. Halloran observed cloudy synovial fluid that was under pressure as well as inflammatory changes in the periarticular cicatrix tissue with cartilage that "was largely destroyed." (Tr. 385). After her procedure, Plaintiff saw Dr. Lavanya Nutankalva, who observed limited range of motion in Plaintiff's shoulder and significant skin lesions which were erythmatious to start, with later progression to pustular before healing. Plaintiff was discharged from the hospital on March 13, 2017. (Tr. 376). By her April 4, 2017, follow-up appointment with Dr. Halloran, Plaintiff's wounds were healing nicely, and Dr. Halloran noted that he was pleased with Plaintiff's recovery. (Tr. 362). However, by May 10, 2017, Plaintiff was experiencing renewed low back and chest wall pain. (Tr. 579).

On November 2, 2017, Plaintiff presented to her primary care provider, Dr. Sam Borrelli, complaining of worsened depression and anxiety. (Tr. 636). Plaintiff reported worsened symptoms after her diagnosis of septic arthritis. *Id*. Furthermore, upon physical examination, Plaintiff demonstrated continued tenderness and pain in the anterior chest region where she had cartilage removed from her previous abscess. *Id*. Ultimately, Dr. Borrelli assessed Plaintiff with major depressive disorder and attention deficit disorder, inattentive type. *Id*.

On January 22, 2018, Plaintiff presented to Dr. Grewal, complaining of renewed back, hip, and shoulder pain. (Tr. 651). During this appointment, Plaintiff reported an aching, cramping, sharp pain that was so severe that it interfered with Plaintiff's sleep. *Id*. Plaintiff repeated these complaints of unresolved pain to Dr. Grewal during follow-up appointments on March 26, 2018,

10

May 29, 2018, and August 2, 2018. (Tr. 660, 658, 656). Ultimately, Dr. Grewal assessed Plaintiff with lumbosacral spondylosis without myelopathy, spinal stenosis of the lumbar region, and low back pain. *Id*.

On October 18, 2018, Plaintiff appeared in Elkhart, Indiana, for a video hearing before ALJ Katich. (Tr. 43). Plaintiff was represented by attorney Tamara L. Renner during the hearing. Plaintiff's daughter, C.E., and vocational expert (VE) Amy Kutschbach also testified during the hearing.

To begin the hearing, ALJ Katich, questioned Plaintiff about her disabling conditions. (Tr. 44). Plaintiff testified that she had previously been diagnosed with septic arthritis of the right clavicular joint with chronic recurrent infection as well as an abscess of the right shoulder joint. *Id*. Furthermore, Plaintiff informed the ALJ that she had been diagnosed with degenerative disc disease of the lumbar spine, chronic pain syndrome, depression, and attention deficit disorder. (Tr. 44-45). Plaintiff described her symptoms, saying, "my sciatic goes down my left hip and leg. I've been fighting that for many years." (Tr. 46). Plaintiff also informed the ALJ that despite taking continually increased pain medications, Plaintiff's pain has "gotten progressively worse. *Id*. Plaintiff explained that she was forced to leave her job due to her symptoms. (Tr. 46-47). At that time, Plaintiff was taking prescribed Fentanyl and Norco to mitigate her pain. *Id*. These drugs were unsuccessful. *Id*. Plaintiff testified that her previous shoulder surgeries "removed all the cartilage in the joint, and so it's, it's painful. . . . I can't lift even, even the amounts that my back would allow. I, I [cannot lift] even a gallon of milk [due to] the pain." (Tr. 47-48). Plaintiff additionally informed the ALJ that she is able to stand and walk for five minutes at a time and sit for about fifteen to twenty minutes. (Tr. 49). Plaintiff required the use of an assistive device while

11

standing or walking and experienced days where her symptoms were worse than others. *Id*. When asked about her mental impairments, Plaintiff explained that she regularly experiences difficulties concentrating. (Tr. 50).

After questioning Plaintiff about her disabling conditions, the ALJ asked Plaintiff about her work history. (Tr. 53). Plaintiff testified that she had previously worked as an assistant branch manager at a credit union. (Tr. 53-54). Additionally, Plaintiff informed the ALJ that she had worked as a mortgage originator. (Tr. 58). Plaintiff explained that she had been forced to leave these positions due to her painful symptoms. (Tr. 55). Furthermore, Plaintiff explained that her anxiety and other mental impairments would preclude her from being able to perform her previous work as an assistant branch manager because she is unable to "deal with the public and people like [she] did in the loan position or the assistant manager position." (Tr. 63). Moreover, Plaintiff testified that she very rarely gets dressed in the morning due to her frequent pain. (Tr. 64).

After Plaintiff finished her testimony, C.E., Plaintiff's daughter, testified concerning her mother's disabling conditions. (Tr. 65). C.E. testified that she currently lives in Niles, Michigan, about forty-five minutes away from the video hearing in Elkhart, Indiana. (Tr. 65). C.E. informed the ALJ that she tries to visit her mother once per week. (Tr. 66). C.E. explained that her mother's condition had deteriorated since her "shoulder incident." *Id*. When C.E. visits her mother, "it's hard for [C.E.] to get [Plaintiff] out of the house" due to her anxiety. *Id*. C.E. reported that it would be "extremely, extremely hard for [Plaintiff]" to be "in public, and in a different environment."  (Tr. 67).

After C.E. finished testifying, the VE testified about Plaintiff's work history. (Tr. 69). The VE characterized Plaintiff's previous work as loan officer (DOT#186.267-018), skilled, SVP 7,

12

sedentary per DOT and as performed and assistant branch manager (DOT#186.167-070), skilled, SVP 7, light per DOT and as performed. (Tr. 71). Next, the ALJ asked the VE about a hypothetical individual who "can perform the full range of light exertional work activity, except that the hypothetical individual can occasionally climb ramps and stairs [and] can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl [and] can never reach overhead with the right upper extremity." (Tr. 72). The VE opined that such an individual would be able to perform Plaintiff's previous work. Tr. 73). However, the VE clarified that additional manipulative restrictions would preclude the loan officer position. *Id*. When asked about a second hypothetical individual who is further restricted to sedentary work, the VE opined that this additional restriction would preclude the assistant branch manager position, but not the loan officer position. (Tr. 74). Moreover, when asked about a hypothetical individual who is restricted as stated above and is further restricted to understanding, remembering, and carrying out simple instructions and tasks; making judgements on simple work-related decisions; and can respond appropriately to occasional interactions with coworkers and supervisors, the VE opined that such an individual could not perform Plaintiff's previous work. (Tr. 75). After the ALJ finished questioning the VE, Plaintiff's attorney asked the VE about further hypothetical restrictions. *Id*. When asked if an individual who was unable to sit for more than fifteen or twenty minutes could perform Plaintiff's previous work, the VE replied, "no." (Tr. 76). After the VE finished testifying, the ALJ concluded the hearing. (Tr. 82).

    In support of remand, Plaintiff argues that the ALJ erroneously relied on VE testimony which departed from the Dictionary of Occupational Titles (DOT). Plaintiff claims that the ALJ failed to provide any evidentiary support or explanation for adopting the VE's testimony that

13

Plaintiff could perform two past relevant jobs with an RFC inconsistent with their definitions within the DOT, the publication on which Social Security relies in determining the individual requirements of particular jobs. (Tr. 19); SSR 0-04p; *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2003); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). A VE is "free to give a bottom line," but the data and reasoning underlying that bottom line must be "available on demand" if the claimant challenges the foundation of the VE's opinions. *Donahue*, 279 F.3d at 446. "This Court has repeatedly noted that if a vocational expert's testimony appears to conflict with the DOT, the ALJ 'must obtain "a reasonable explanation for the apparent conflict."' And that a claimant's failure to object during a hearing cannot excuse an ALJ's failure to do so." *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (citing *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008)) (*per curiam*) (quoting SSR 00-4p, 2000 WL 1898704 (Dec. 4. 2000)). The Seventh Circuit has held that "an ALJ can accept conflicting testimony if the vocational expert's experience and knowledge in a given situation exceeds that of the DOT's authors, or when the [vocational expert]'s contrary testimony is based on information in other reliable publications." *Id*.

Plaintiff argues that, in the present case, the ALJ made no inquiry whatsoever into determining whether the VE's "experience and knowledge" exceeded that of the DOT's authors. Plaintiff contends that the ALJ merely accepted the testimony and erroneously deemed it consistent with the DOT.

"If the basis of the vocational expert's conclusions is questioned at the hearing . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." *Id*. SSR 00-4p places the burden on the ALJ of evaluating whether a VE's testimony is

14

consistent with the DOT. *Prochaska v. Barnhart*, 454 F.3d 731, 735-736 (7th Cir. 2006). "The inadequacy of vocational expert testimony has been remarked in a number of decisions by this and other courts, and by informed commentators." *Herrmann v. Colvin*, 772 F.3d 1110, 1112-14 (7th Cir. 2014). Where there is an inconsistency between the VE's testimony and the DOT, "the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is not disabled." (SSR 00-4p) Remand is appropriate when an ALJ leaves an "unresolved potential inconsistency in the evidence that should have been resolved." *Herrmann v. Colvin*, 772 F.3d 1110, 1112-14 (7th Cir. 2014)(citations omitted).

In the present case, at Step Four, the ALJ found Plaintiff capable of performing only two past relevant jobs, one of which the DOT defines as requiring "occasional" (or up to 1/3 of an eight-hour workday) and the other "frequent" (or up to 2/3 of an eight-hour workday) reaching in all directions. However, the ALJ's RFC assessment allowed for no overhead reaching whatsoever with the right upper extremity and only occasional (or up to 1/3 of an eight-hour workday) lateral and forward reaching with the same. (Tr. 15). Thus, these limitations, in the aggregate, allowed for less than "occasional" reaching in all directions. If a person can reach forward and laterally occasionally but never overhead, that individual is not reaching in all directions at a frequency commensurate with the term "occasional" as the Social Security Administration defines it. (*See* SSR 83-10) As the VE acknowledged in her testimony during the administrative hearing, the DOT does not differentiate between directions a person can or cannot reach. (TR.73). In concluding that Plaintiff, who could not reach in all directions at even an "occasional" frequency, could perform two jobs which the DOT defines as requiring "frequent" and "occasional" reaching in all directions, the ALJ wholly relied on the VE's testimony that this was possible. Despite the VE's

15

acknowledgment that this testimony was, in fact, inconsistent with the way the DOT views the frequency of reaching, the ALJ concluded in her decision that the VE testimony at issue was consistent with the DOT. (Tr.15, 76-77).

As Plaintiff points out, the difficulty with the ALJ's reliance on the VE's testimony is that, as they both admitted during the hearing, it was not consistent with the DOT. The Selective Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO) defines the jobs that the ALJ concluded Plaintiff could perform as requiring "frequent" and "occasional" reaching in all directions, respectively: Loan Officer (DOT # 186.267-018) and Assistant Branch Manager (DOT # 186.167-070). While the ALJ may base her decision on VE testimony which departs from the DOT and conclude an individual does not actually need to be able to "occasionally" or "frequently" reach in all directions to perform the aforementioned past relevant jobs, an ALJ must elicit and rely upon a reasonable explanation for doing so in order to bear her burden of demonstrating that her departure from the DOT was justified and supported. *Konda D. v. Saul*, 421 F. Supp. 3d 599 (N.D. Ind. October 21, 2019); *Butler v. Berryhill*, No. 1:18cv59, 2019 U.S. Dist. LEXIS 17863 (N.D. Ind. Feb. 4, 2019); citing *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (citing *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008)) *(per curiam)* (quoting SSR 00-4p).

In the present case, no such explanation was given within the ALJ's decision, despite the fact that the ALJ and the VE agreed during the administrative hearing that the testimony in question was not based on the DOT. (Tr. 76-77). The Seventh Circuit has continually rejected such a departure from the DOT. *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016); *Overman v. Astrue,* 546 F.3d 456, 462-63 (7th Cir. 2008)) (*per curiam*); *Herrmann v. Colvin*, 772

16

F.3d 1110, 1112-14 (7th Cir. 2014). Consequently, the ALJ committed two errors here. First she based her Step Four conclusion that Plaintiff could perform her past relevant work on VE testimony which was inconsistent with the DOT without eliciting any good explanation for doing so. Second, the ALJ mistakenly deemed the VE testimony consistent with the DOT, while failing to offer any evidentiary basis to support a *de facto* conclusion that the VE's knowledge of the subject was superior to that of the authors of the DOT.

Accordingly, due to these errors, remand is required.

## Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED.

Entered: September 17, 2021.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court